No. 23-11857-HH

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

―――――――――

**UNITED STATES OF AMERICA,**
           *Plaintiff/Appellee*,

**v.**

**OLSON JOSEPH,**
           *Defendant/Appellant.*

―――――――――

**On Appeal from the United States District Court
for the Southern District of Florida**

―――――――――

**INITIAL BRIEF OF APPELLANT
OLSON JOSEPH**

―――――――――

               **HECTOR A. DOPICO**
               **Federal Public Defender**
               **ANSHU BUDHRANI**
               **Assistant Federal Public Defender**
               **Attorneys for Appellant**
               **150 West Flagler Street, Suite 1700**
               **Miami, Florida 33130**
               **Telephone No. (305) 530-7000**

**THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)**

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

### United States of America v. Olson Joseph
### Case No. 23-11857-HH

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Altonaga, Hon. Cecilia M.

Becerra, Hon. Jacqueline

Bryn, Brenda Greenberg

Budhrani, Anshu

Caruso, Michael

Colan, Jonathan D.

Damian, Hon. Melissa

Dopico, Hector A.

Gonzalez, Juan Antonio

Grove, Daren

Houlihan, R. D'Arsey

Jacobs, Andrew Scott

Joseph, Olson a/k/a/ Olson, Joseph

C-1 of 2

Kroll, Rachel

Lapointe, Markenzy

Matzkin, Daniel

Maultasch, Lindsey

McAliley, Hon. Chris M.

Mollison, Kathleen Ellen

Reid, Hon. Lisette M.

Rubio, Lisa Tobin

Senior, Robert

Silverstein, Joan

Torres, Hon. Edwin G.

*/s/ Anshu Budhrani*
ANSHU BUDHRANI

## STATEMENT REGARDING ORAL ARGUMENT

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court held that the Second Amendment protects an individual's right to carry a gun for self-defense outside of the home. *Id.* at 9. In Florida, state legislators have passed a number of laws to uphold and promote this constitutional right. One such law—passed in 2015— amended Florida's concealed carry statute in favor of the concealed carry of firearms. That is, the concealed carry of a firearm in Florida now carries with it a presumption of legality. Here, however, the district court inverted that presumption of legality and approved of a seizure based upon nothing more than the mere observation of a concealed firearm in the pocket of Olson Joseph's hoodie as he walked down the street.

Allowing such a seizure to stand would render the protections afforded by the Second Amendment a nullity and eviscerate critical Fourth Amendment protections. Because this appeal raises important constitutional issues of first impression given recent changes in the law, Mr. Joseph respectfully submits that oral argument is necessary to the just resolution of this appeal, and will significantly enhance the decision-making process.

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................... i

TABLE OF CITATIONS ........................................................ v

STATEMENT OF JURISDICTION ............................................ 1

STATEMENT OF THE ISSUES ................................................ 2

STATEMENT OF THE CASE .................................................. 3

   I.   Course of Proceedings, Facts, and Disposition Below ................. 3

      A. Course of Proceedings and Disposition Below .......................... 3

      B. Facts ...................................................................... 5

   II.   Standards of Review .................................................... 9

SUMMARY OF THE ARGUMENT ........................................ 10

ARGUMENT AND CITATIONS TO AUTHORITY .............................. 11

   I.   Law Enforcement Officers Violated the Fourth Amendment When They Seized Mr. Joseph Without Probable Cause or a Reasonable Suspicion ................................................................ 11

      A. Mr. Joseph Was Unquestionably Immediately Seized ............ 14

B. Mr. Joseph's Seizure Was So Intrusive, However, That it Was Akin to an Arrest ......................................................... 15

C. Mr. Joseph's Seizure Was Effectuated Without Reasonable Suspicion of a Crime, Let Alone Probable Cause, Because the Concealed Carry of a Firearm in Florida is Presumptively Lawful ......................................... 17

II. Following *Bruen*, 18 U.S.C. § 922(g)(1) Is Facially Unconstitutional, and Mr. Joseph's Conviction Must Be Vacated ............................................................................................... 30

A. Background: The Evolution of Second Amendment Law from *Heller* to *Bruen* ............................................................ 30

B. *Bruen* Step One: The Second Amendment's "plain text" Protects Mr. Joseph's Public Possession of a Handgun ....... 38

C. *Bruen* Step Two: The Government Cannot Meet Its Burden of Showing § 922(g)(1) Is Consistent With the Nation's "historical tradition of firearm regulation"............ 42

CONCLUSION ........................................................................... 49

CERTIFICATE OF COMPLIANCE....................................... 50

iii

CERTIFICATE OF SERVICE.................................................................51

# TABLE OF CITATIONS

## CASES

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*,

    910 F.3d 106 (3d Cir. 2018) ................................................................ 42

*Babb v. Sec'y, Dep't of Veterans Affairs*,

    992 F.3d 1193 (11th Cir. 2021) ........................................................ 38

*Burnett v. State*,

    246 So. 3d 516 (Fla. 5th DCA 2018) ............................................... 22

*Carter v. State*,

    389 So. 3d 759 (Fla. 2nd DCA 2024) .............................................. 21

*City of Indianapolis v. Edmond*,

    531 U.S. 32 (2000) ............................................................................ 27

*Commonwealth v. Hicks*,

    208 A.3d 916 (Pa. 2019) .................................................................. 22

*Dawson v. Scott*,

    50 F.3d 884 (11th Cir. 1995) ........................................................... 38

*Delaware v. Prouse*,

    440 U.S. 648 (1979) ......................................................................... 26

v

*District of Columbia v. Heller,*

    554 U.S. 570 (2008) ........................31, 32, 33, 36, 37, 39, 40, 42, 45,46

*Duffie v. City of Lincoln,*

    834 F.3d 877 (8th Cir. 2016) ............................................................25

*Dunaway v. New York,*

    442 U.S. 200 (1979) ........................................................................12

*Edwards v. Prime, Inc.,*

    602 F.3d 1276 (11th Cir. 2010) ......................................................37

*Florida v. Bostick,*

    501 U.S. 429 (1991) ........................................................................14

*Florida v. J.L.,*

    529 U.S. 266 (2000) ........................................................................24

*Florida v. Royer,*

    460 U.S. 491 (1983) ........................................................................13

*Illinois v. Wardlow,*

    528 U.S. 119 (2000) ........................................................................28

*INS v. Delgado,*

    466 U.S. 210 (1984) ........................................................................14

*Jackson v. State,*

    289 So. 3d 967, 969 (Fla. 4th DCA 2020) ..........................................20

*Kanter v. Barr,*

    919 F.3d 437 (7th Cir. 2019).........................................................43, 44

*Kilburn v. Fla.,*

    297 So. 3d 671 (Fla. 1st DCA 2020)............................................18, 22

*Mackey v. State,*

    124 So. 3d 176 (Fla. 2013)...................................................................19

*McCoy v. United States,*

    266 F.3d 1245 (11th Cir. 2001)............................................................9

*Miller v. Harget,*

    458 F.3d 1251 (11th Cir. 2006).....................................................14, 15

*Minnesota v. Dickerson,*

    508 U.S. 366 (1993)..........................................................................12

*Nat'l Rifle Ass'n v. Bondi,*

    __ F.4th __, 2023 WL 2484818 (11th Cir. Mar. 9, 2023)...................32

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*

    597 U.S. 1 (2022)............................... 2, 10, 30-39, 41-43, 45, 46, 48, 48

vii

*Norman v. Fla.*,

    159 So. 3d 205 (Fla. 4th DCA 2015) .................................................. 18

*Northrup v. City of Toledo Police Dep't*,

    785 F.3d 1128 (6th Cir. 2015) ........................................................... 25

*Regalado v. State*,

    25 So. 3d 600 (Fla. 4th DCA 2009) .................................................... 23

*Reynolds v. Behrman Capital IV L.P.*,

    988 F.3d 1314 (11th Cir. 2021) .......................................................... 37

*Santiago-Lugo v. Warden*,

    785 F.3d 467 (11th Cir. 2015) ........................................................... 38

*Schwab v. Crosby*,

    451 F.3d 1308 (11th Cir. 2006) .......................................................... 37

*Silvester v. Becerra*,

    138 S. Ct. 945 (2018) ......................................................................... 31

*Slydell v. State*,

    240 So. 3d 134 (Fla. 2d DCA 2018) .................................................... 23

*Sprint Communications Co. v. APCC Services, Inc.*,

    554 U.S. 269 (2008) ........................................................................... 45

*Terry v. Ohio,*

    392 U.S. 1 (1968) ................................................................... 12, 13, 14

*United States v. Acosta,*

    363 F.3d 1141 (11th Cir. 2004) .................................................. 16, 17

*United States v. Archer,*

    531 F.3d 1347 (11th Cir. 2008) .......................................................... 37

*United States v. Berry,*

    670 F.2d 583 (5th Cir. 1982) .............................................................. 12

*United States v. Black,*

    707 F.3d 531 (4th Cir. 2013) .............................................................. 24

*United States v. Booker,*

    644 F.3d 12 (1st Cir. 2011) ................................................................ 44

*United States v. Brown,*

    925 F.3d 1150 (9th Cir. 2019) ........................................................... 25

*United States v. Cortez,*

    449 U.S. 411 (1981) ........................................................................... 29

*United States v. Dawson,*

    ___ F.4th ___, 2023 WL 2781361 (11th Cir. 2023) .............................. 9

*United States v. Espinosa–Guerra,*

    805 F.2d 1502 (11th Cir. 1986) .................................................. 12, 13

*United States v. Howard,*

    742 F.3d 1334 (11th Cir. 2014) ......................................................... 38

*United States v. Iguaran,*

    821 F.3d 1335 (11th Cir. 2016) ........................................................... 9

*United States v. Jackson,*

    55 F.4th 846 (11th Cir. 2022) ........................................................... 38

*United States v. Jimenez-Shilon,*

    34 F.4th 1042 (11th Cir. 2022) ......................................................... 41

*United States v. Jimenz-Shiloh,*

    34 F.4th 1042 (11th Cir. 2022) ......................................................... 31

*United States v. Leo,*

    792 F.3d 742 (7th Cir. 2015) ............................................................. 25

*United States v. Lewis,*

    672 F.3d 232 (3d Cir. 2012) .............................................................. 24

*United States v. Lopez,*

    562 F.3d 1309 (11th Cir. 2009) ......................................................... 38

*United States v. Meza-Rodriguez,*

    798 F.3d 664 (7th Cir. 2015) ............................................................. 41

*United States v. Nunez,*

    455 F.3d 1223 (11th Cir. 2006) ........................................................... 9

*United States v. Peters,*

    60 F.4th 855 (4th Cir. 2023) ............................................................. 28

*United States v. Rahimi,*

    144 S. Ct. 1889 (2024) ....................................................................... 30

*United States v. Rozier,*

    598 F.3d 768 (11th Cir. 2010) ..................................................... 36, 37

*United States v. Saac,*

    632 F.3d 1203 (11th Cir. 2011) ........................................................... 9

*United States v. Sharpe,*

    470 U.S. 675 (1985) ....................................................................... 13, 16

*United States v. Skoien,*

    614 F.3d 638 (7th Cir. 2010) ......................................................... 43, 44

*United States v. Sokolow,*

    490 U.S. 1 (1989) ............................................................................... 27

*United States v. Ubiles*,

    224 F.3d 213 (3d Cir. 2010) .............................................................24

*United States v. Verdugo–Urquidez*,

    494 U.S. 259 (1990) ...................................................................40

*United States v. Williams*,

    731 F.3d 678 (7th Cir. 2013) ...........................................................29

**STATUTES**

18 U.S.C. § 3231 ...................................................................1

18 U.S.C. § 922(g)(1)............................................................... 2, 3, 9, 10

28 U.S.C. § 1291 ...................................................................1

Fla. Stat. § 790.01 (2014) .........................................................19

Fla. Stat. § 790.01 (2015) .........................................................19

**OTHER AUTHORITIES**

Act of May 8, 1792, § 1, 1 Stat. 271........................................................47

Antonin Scalia & Bryan A. Garner, *Reading Law: The*

    *Interpretation of Legal Texts* (2012) .................................................40

Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60

    Hastings L.J. 1371 (2009).............................................................45

Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805)..........................................................47

Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367-70 (1799) .................................................................................48

II Noah Webster, *An American Dictionary of the English Language* (1828)................................................................................40

*In re: Standard Jury Instr. in Crim. Cases-Rep. 2017-10*, 253 So. 3d 1040 (Fla. 2018) ..............................................................................20

Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36 (1797)...............................................................................................48

Marbury, Digest of Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802) ..........................................................47

Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809)..........................................47

Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808) ......................................................48

Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792)............................................................47

Wright and Potter, 7 Acts and Laws of the Commonwealth of

Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898)............47

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. II ...............................................................31

U.S. Const. amend. IV ...........................................................11

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231, because the defendant was charged with an offense against the laws of the United States. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which confers jurisdiction on the courts of appeals from final decisions of the district courts. This appeal was timely filed on June 2, 2023 (DE 64) from the final judgment entered on May 24, 2023 (DE 63), disposing of all claims between the parties to this appeal.

## STATEMENT OF THE ISSUES

I.    Whether law enforcement officers violated the Fourth Amendment when they seized Mr. Joseph without probable cause to believe a felony had been or was being committed, nor a reasonable, articulable, and particularized suspicion that Mr. Joseph was engaged in, or was about to engage in, criminal activity.

II.   Whether, pursuant to the analysis dictated by *Bruen*, 18 U.S.C. § 922(g)(1) is facially unconstitutional under the Second Amendment, which requires that Mr. Joseph's § 922(g)(1) conviction be vacated.

## STATEMENT OF THE CASE

### I.    Course of Proceedings, Facts, and Disposition Below

#### A. Course of Proceedings and Disposition Below

On November 2, 2022, a federal grand jury sitting in the Southern District of Florida returned a one-count indictment against Olson Joseph, charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).[1]  (DE 3.)

Mr. Joseph filed a motion to suppress the physical evidence recovered—the firearm—as well as his statements.[2]  (DE 19.)  After holding an evidentiary hearing, and listening to the testimony of Detective Escarra and Detective Young—as well as additional argument from both sides—the district court denied Mr. Joseph's motion to suppress.  (DE 43.)  In its written order, the court found that officers had

---

[1] The indictment was later superseded to correct an error in Mr. Joseph's name.  (DE 35.)  In the original indictment, his name was incorrectly listed as "Joseph Olson."  The district court was made aware of this error, and ordered that the indictment be amended to reflect Mr. Joseph's true name.  (DE 17; DE 18.)  Unfortunately, both the district court and Eleventh Circuit dockets still refer to Mr. Joseph incorrectly as "Joseph Olson."

[2] The district court found that officers unlawfully interrogated Mr. Joseph while he was in custody, and therefore suppressed those statements.  (DE 43.)  Therefore, that issue is not before the Court.

3

conducted a *Terry* stop of Mr. Joseph—not an arrest—and that such stop was reasonable when considering the totality of the circumstances, including the presence of a concealed firearm in a "high-crime area." (DE 43:5–12.)    More specifically, though the district court agreed with the government that the mere observation of a concealed firearm was enough to establish reasonable suspicion of a violation of Florida's concealed carry law, it further reasoned that the seizure was reasonable after considering the totality of the circumstances.  (DE 43:10–12.)

Thereafter, Mr. Joseph entered a conditional plea of guilty.  (DE 50.)  The plea agreement made clear that:

> Pursuant to Fed. R. Crim. P. 11(a)(2), [Mr. Joseph] reserves his right to appeal the District Court's Order denying [his] motion to suppress (D.E. 43). This reservation of appellate rights is limited to the Fourth Amendment issue that the defendant raised in his motion to suppress (D.E. 19), his Reply to the Government's Response (D.E. 29), and at the hearing held on the Motion to Suppress (D.E. 36).

(DE 50:5.)  The government acknowledged that an order suppressing the firearm, "or an appeal granting such relief," would be "case dispositive."

(*Id.*)  Moreover, the government agreed that were relief to be ordered by

this Court, Mr. Joseph would be allowed to "withdraw/vacate" his plea of guilty.  (*Id.*)

At the sentencing hearing on May 24, 2023, the district court sentenced Mr. Joseph to a term of imprisonment of 46 months, followed by 3 years of supervised release.  (DE 72:16.)  Mr. Joseph timely filed a notice of appeal (DE 64), and remains incarcerated.

### B. Facts

In the early afternoon hours of October 19, 2022, plain-clothes detectives in unmarked vehicles were conducting surveillance in an area of about a half-a-mile radius known to them for drug sales as well as an alleged drive-by shooting that had occurred about two weeks prior.  (DE 67:7, 9–10.)  They were surveilling foot traffic—individuals who walk into a home and exit 30 seconds later—as well as looking for hand-to-hand transactions—individuals who exchange money for drugs with a handshake.  (DE 67:9–10.)

Detectives observed a man—Mr. Joseph—getting a haircut on the front lawn of a house in the residential neighborhood they were surveilling.  (DE 67:13.)  They surveilled Mr. Joseph at the house for approximately 40 to 45 minutes before he left.  (DE 67:13.)  During that

time, the detectives did *not* observe any foot traffic into or out of that house that would have been indicative of drug sales nor did they observe any hand-to-hand transactions. (DE 67:13.) Mr. Joseph, completely unaware that he was being watched, left the house on foot and continued walking at a normal pace with his hands in the front pocket of the hoodie he was wearing. (DE 67:14.) Detective Escarra—stationed about a block and a half away and using the assistance of binoculars—observed what he believed to be the slide of a firearm imprinted in the front pocket of that hoodie. (DE 67:12–13.) As Mr. Joseph continued walking and made a left turn, both Detective Escarra and Detective Young observed what they believed to be the handle of a firearm in the front pocket of Mr. Joseph's hoodie. (DE 67:14.)

The detectives then immediately seized Mr. Joseph. At that point, they knew almost nothing about him—they did not know his name; they did not know whether he had a concealed carry license; they did not know if he had any criminal history; they did not see him conduct any hand-to-hand transactions; and, most importantly, they had no reason to believe he was involved in the shooting that had allegedly occurred outside that house about two-weeks prior. (DE 67:21–23, 52–53.) The only thing they

knew was that they believed him to be carrying a gun, which was properly concealed from ordinary sight and not being brandished or displayed in any other threatening manner. (DE 67:28.)

Detective Escarra approached Mr. Joseph with his gun drawn and pointed directly at Mr. Joseph. He yelled at Mr. Joseph, "Let me see your f*cking hands! Let me see your hands!" (Gov't Ex. 1, Body Worn Camera at 00:30.) Mr. Joseph immediately complied and put his hands up. He did not try running away. (DE 67:34.)



Detective Young stopped his unmarked car right in front of Mr. Joseph and simultaneously approached Mr. Joseph with his gun drawn. (Gov't Ex. 1, Body Worn Camera at 00:40.)



As soon as he reached Mr. Joseph, Detective Escarra reached directly into Mr. Joseph's front hoodie pocket and pulled out a firearm, which he handed to Detective Young. (DE 67:29.) Detective Escarra then handcuffed Mr. Joseph and searched him again, this time taking possession of Mr. Joseph's cell phone. (DE 67:30.) When Mr. Joseph asks, "what's going on," Detective Escarra tells him that he "can't be doing that," referring to Mr. Joseph's possession of a concealed gun. (Gov't Ex. 1, Body Worn Camera at 01:30; DE 67:30–31.)

Mr. Joseph remained in police custody, and was eventually transported to the police station. (DE 67:33.)

## II.    Standards of Review

With regard to a motion to suppress, this Court reviews the district court's factual findings for clear error, and its legal conclusions de novo. *United States v. Nunez*, 455 F.3d 1223, 1225 (11th Cir. 2006).

The constitutionality of 18 U.S.C. § 922(g) under the Second Amendment "is a jurisdictional issue" that Mr. Joseph "did not waive upon pleading guilty." *United States v. Saac*, 632 F.3d 1203, 1208 (11th Cir. 2011) (holding that constitutional challenge to statute of conviction is jurisdictional). That jurisdictional issue is reviewable de novo in this appeal. *See United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016) ("The district court's subject matter jurisdiction is a question of law that we review *de novo* even when it is raised for the first time on appeal"; citing *McCoy v. United S*tates, 266 F.3d 1245, 1249 (11th Cir. 2001) ("[J]urisdictional errors are not subject to plain- or harmless-error analysis")). *See also United States v. Dawson*, ___ F.4th ___, 2023 WL 2781361, at *9 (11th Cir. 2023) ("[P]arties cannot waive the application of the correct law," the plain meaning of a word, or application of the rule of lenity).

## SUMMARY OF THE ARGUMENT

Olson Joseph was walking down the street in the middle of the afternoon, having just gotten his haircut, when he was seized at gunpoint by undercover detectives. Their reason for seizing him—he had a concealed gun. That is not enough to pass constitutional muster, especially not in the State of Florida, whose legislature has amended the law to make the carrying of a concealed firearm a presumptively lawful activity. As such, law enforcement officers here did not have any suspicion—let alone a reasonable, articulable, and particularized suspicion—that Mr. Joseph was committing, or was about to commit, a crime. Nor did the detectives have probable cause to justify his immediate arrest. As a result, Mr. Joseph's seizure was unconstitutional, and this Court must reverse the denial of his motion to suppress and vacate his conviction.

Additionally, the Court should vacate Mr. Joseph's conviction because 18 U.S.C. § 922(g)(1) is facially unconstitutional under the Second Amendment after application of *Bruen*'s two-part test.

## ARGUMENT AND CITATIONS TO AUTHORITY

"Let's stop him, he has a gun."  (DE 67:14.)  That is the sole basis for the seizure of Mr. Joseph.  Mr. Joseph was observed getting a haircut and subsequently walking down the street.  He was carrying a concealed firearm in the front pocket of his hoodie—an action historically protected by the Second Amendment and actively encouraged by the Florida Legislature.  Yet somehow, Mr. Joseph's presumptively lawful possession of a concealed firearm led to his immediate arrest.  Detectives seized and immediately searched him without probable cause or a reasonable, articulable, and particularized suspicion.  As such, the fruits of their seizure and immediate search—the firearm—must be suppressed.

I.  **LAW ENFORCEMENT OFFICERS VIOLATED THE FOURTH AMENDMENT WHEN THEY SEIZED MR. JOSEPH WITHOUT PROBABLE CAUSE OR A REASONABLE SUSPICION**

The Fourth Amendment guarantees the "right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV.  "Time and again, th[e] [Supreme] Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few

11

specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (quotations omitted).

To aid its analysis of whether a Fourth Amendment violation occurred, this Court has identified three tiers of police-citizen encounters: (1) police-citizen communications involving no coercion or detention; (2) brief seizures; and (3) full-scale arrests. *United States v. Espinosa–Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986) (citing *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982)). The first category of consensual encounters does not implicate Fourth Amendment scrutiny. *Id.* The second category involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave. In order to justify such a seizure, the government must show a reasonable, articulable suspicion that the person has committed or is about to commit a crime. *Id. See also Terry v. Ohio*, 392 U.S. 1 (1968). This type of brief encounter is an exception to the general rule that seizures must generally be supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 211–12 (1979). The exception is justified, because the stop involves substantially less intrusion than that associated with an arrest. *Dunaway*, 442 U.S. at 212; *Terry*, 392 U.S. at

12

22–24.  The Supreme Court, however, requires that law enforcement's actions be no more intrusive than necessary.  *Florida v. Royer*, 460 U.S. 491, 504 (1983).  Finally, when the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest, and probable cause is required.  *Espinosa–Guerra*, 805 F.2d at 1506 (citing *Royer*, 460 U.S. at 499–500).  While the Supreme Court has not clearly delineated the boundary between an arrest and a *Terry* stop, it is clear that a de facto arrest requiring probable cause may occur, even where law enforcement officers do not formally place an individual under arrest.  *United States v. Sharpe*, 470 U.S. 675 (1985).

Here, law enforcement officers unquestionably immediately seized Mr. Joseph upon seeing what they believed to be a gun in the front pocket of his hoodie.  They did so without reasonable, articulable, particularized suspicion that he was committing or was about to commit a crime.  And, in fact, their encounter with Mr. Joseph was so intrusive, it was a full-blown arrest at its inception, completely devoid of any probable cause that Mr. Joseph had committed or was committing a crime.

13

**A. Mr. Joseph Was Unquestionably Immediately Seized**

A person is seized by the police, and thus entitled to challenge the government's actions under the Fourth Amendment, when the officer, "'by means of physical force or show of authority,'" terminates or restrains the person's freedom of movement. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Terry*, 392 U.S. at 19). Determining whether a person is seized requires application of the "free to leave" test: a person is seized when "a reasonable person would [not] feel free to end the encounter" with the police. *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006) (quotation marks omitted); *see also INS v. Delgado*, 466 U.S. 210, 215 (1984) (holding that a seizure begins when "all the circumstances surrounding the incident" are such that "a reasonable person would have believed that he was not free to leave").

In determining whether "a reasonable person would [not] feel free to end the encounter," courts consider: "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons;

14

any physical touching of the suspect; and the language and tone of voice of the police." *Miller*, 458 F.3d at 1257 (quotation marks omitted).

Here, Mr. Joseph was, at a minimum, immediately seized. Mr. Joseph was surrounded by police vehicles and impeded from leaving. Detective Escarra pointed his gun directly at Mr. Joseph and yelled profanity at him, ordering Mr. Joseph to stop moving and put his hands up. Detective Escarra then physically searched Mr. Joseph and removed a gun from the front pocket of Mr. Joseph's hoodie. While Mr. Joseph was being approached by Detective Escarra, he was also being approached by Detective Young, who stopped his car in front of Mr. Joseph and moved toward Mr. Joseph with his gun drawn. Detective Escarra handcuffed Mr. Joseph. He then put his hands on Mr. Joseph again, this time reaching into Mr. Joseph's hoodie pocket and to take Mr. Joseph's cellphone. No reasonable person would feel "free to leave" in this situation.

## B. Mr. Joseph's Seizure Was So Intrusive, However, That it Was Akin to an Arrest

Sometimes a seizure can morph into a de facto arrest, which is what occurred here right from the start. Mr. Joseph's stop was not "reasonably related in scope to the circumstances which justified the interference in

15

the first place." *Sharpe*, 470 U.S. at 682 (internal quotation marks and citation omitted). There is a difference between an investigative stop of limited duration and a detention that amounts to an arrest, with the difference-maker being "one of extent, [where] the line of demarcation result[s] from the weighing of a limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *United States v. Acosta*, 363 F.3d 1141, 1145–46 (11th Cir. 2004).

Here, the stop was completely unjustified from its inception, and grossly intrusive. There was no "law enforcement purpose[]" served by Mr. Joseph's detention in this manner. *Acosta*, 363 F.3d at 1146. He was completely unknown to the detectives conducting surveillance, and was not observed engaging in any criminal conduct whatsoever. He was observed peacefully walking down the street, going about his day, when the detectives surrounded him at gunpoint. He was cursed at, immediately searched, and handcuffed. He was then searched again— even though Detective Escarra had already removed the gun from Mr. Joseph's hoodie pocket, thereby ensuring the safety of the police officers on scene. Detective Escarra took Mr. Joseph's cellphone and refused to

return it to Mr. Joseph, telling him that he could not talk on the phone right now. (Gov't Ex. 1, Body Worn Camera at 03:00.) Detective Escarra also told Mr. Joseph that he could not be carrying a firearm, even though, at that point, detectives knew nothing about his licensure status or his criminal history. Detective Escarra requested a transport for Mr. Joseph to be taken to the police station without even waiting to hear back from his fellow officers about their investigation into Mr. Joseph. (DE 67:33–34.) Detective Escarra's actions made clear that not only was Mr. Joseph not free to leave, he was under arrest. Any alleged "investigation" being done would not change that.

Overall, the detectives here far exceeded the bounds of what is considered appropriate under *Terry*. Their maximally intrusive "investigation techniques" amounted to a de facto arrest of Mr. Joseph, *Acosta*, 363 F.3d at 1146, which, as a result, required a showing of probable cause.

### C. Mr. Joseph's Seizure Was Effectuated Without Reasonable Suspicion of a Crime, Let Alone Probable Cause, Because the Concealed Carry of a Firearm in Florida is Presumptively Lawful

"Bearing arms is not only legal; it also is a specifically enumerated right in both the federal and Florida constitutions." *Kilburn v. Fla.*, 297

17

So. 3d 671, 674 (Fla. 1st DCA 2020); *see also Norman v. Fla.*, 159 So. 3d 205, 212 (Fla. 4th DCA 2015) (holding that based on the Second Amendment, "it is clear that a total ban on the public carrying of ready-to-use handguns outside the home cannot survive a constitutional challenge under any level of scrutiny"), *approved*, 215 So. 3d 18 (Fla. 2017).

The Florida Legislature has worked hard to both protect and promote its citizens' right to bear arms.  Critical here, carrying a concealed firearm is a presumptively lawful activity in the State of Florida.  In 2015, the Florida Legislature purposefully and intentionally amended its concealed carry statute—Fla. Stat. § 790.01—in favor of firearm possession.  Therefore, the mere possession of a concealed firearm, without more, does *not* provide any suspicion, let alone reasonable suspicion, of a crime.

Before 2015, § 790.01, entitled "Carrying concealed weapons," provided, in pertinent part:

> (2) [A] person who carries a concealed firearm on or about his or her person commits a felony of the third degree . . . .

18

> (3) This section does not apply to a person licensed
> to carry a concealed weapon or a concealed firearm
> pursuant to the provisions of s. 790.06.

Fla. Stat. § 790.01 (2014). The Florida Supreme Court interpreted the pre-2015 version of § 790.01 to mean that "licensure is an affirmative defense to a charged crime of carrying a concealed weapon . . . and the lack of a license is *not* an element of the crime." *Mackey v. State*, 124 So. 3d 176, 181 (Fla. 2013) (emphasis in original). That is, regardless of licensure status, individuals engaged in behavior that was presumed criminal when they carried a concealed firearm, and bore the burden of proving otherwise through presentment of a concealed carry license.

In 2015, however, the Florida Legislature retitled § 790.01 as "Unlicensed carrying of concealed weapons or concealed firearms," and amended § 790.01 to provide, in pertinent part:

> (2) . . . [A] person *who is not licensed* under s. 790.06 and who carries a concealed firearm on or about his or her person commits a felony of the third degree . . . .

Fla. Stat. § 790.01 (2015) (emphasis added). That is, the Legislature's amendment of § 790.01 "eliminated the pre-2015 version's burden of requiring *a defendant to prove, as an affirmative defense to the crime*, that he or she was 'licensed to carry a concealed weapon or a concealed

19

firearm,'" and instead "requires *the state to prove, as an element of the crime*, that 'the defendant was not licensed to carry a concealed firearm.'" *Jackson v. State*, 289 So. 3d 967, 969 (Fla. 4th DCA 2020) (emphasis in original). The standard jury instructions for the offense were amended accordingly "to include a third element that requires the State to prove that the defendant did not have a license to carry a concealed weapon or firearm at the time he or she did the carrying." *Id.* (quotation marks omitted). *See also In re: Standard Jury Instr. in Crim. Cases-Rep. 2017-10*, 253 So. 3d 1040, 1041 (Fla. 2018) ("Criminal jury instruction 10.1 (Carrying a Concealed [Weapon] [Firearm]) is amended to include a third element that requires the State to prove that the defendant did not have a license to carry a concealed weapon or firearm at the time he or she did the carrying.").

This change is significant because, as relevant here, "the crime of carrying a concealed firearm is complete *only* upon proof that the person carrying the concealed firearm lacks a license to do so." *Id.* at 972 (emphasis added). That is, it is no longer presumed to be a crime to carry a concealed firearm in Florida. Instead, such activity is presumptively legal unless law enforcement officers have reason to suspect that an

20

individual lacks a concealed carry permit. So, here, the mere observation of what detectives believed to be a firearm in the front pocket of Mr. Joseph's hoodie, without more, is insufficient evidence of the crime of unlicensed concealed carry, or any crime at all.

A Florida court of appeals—the Second District—recently addressed this very issue (and an almost-identical fact pattern) in *Carter v. State*, 389 So. 3d 759 (Fla. 2nd DCA 2024). There, in October 2021, in full daylight, undercover officers surveilling an apartment complex "located in a high crime area" observed the defendant walking with what appeared to be a firearm in his waist. *Carter*, 389 So. 3d at 761. Officers stopped him because he had a gun. *Id.* The appeals court roundly rejected the officers' contention that an individual's possession of a concealed firearm in an area considered to be high crime provided reasonable suspicion of criminal activity:

> We emphasize that the testifying officers here expressly denied seeing [the defendant] do anything suspicious besides having a firearm. The mere additional facts that he did so in an area considered to be high in crime and that he declined to answer officer questions yelled from twenty-five feet behind him did not operate to transform the officers' suspicion into a reasonable one.

*Id.* at 764 (quotation marks and alterations omitted).

In holding that officers lacked reasonable suspicion of criminal activity based upon the defendant's possession of a concealed firearm, the Second District Court of Appeal joined Florida's First, Fourth, and Fifth District Courts of Appeal.[3] *See, e.g.*, *Kilburn*, 297 So. 3d at 675 (noting, "The citizens of Florida have spoken through their Legislature and have stated that those who possess a license to carry a concealed weapon have the right to carry a concealed firearm," before holding, "[T]he 2015 statutory change made it even more clear that a law enforcement officer may not use the presence of a concealed weapon as the sole basis for seizing an individual"); *Burnett v. State*, 246 So. 3d 516, 518 (Fla. 5th DCA 2018) ("We hold that possession of a concealed firearm, without

---

[3] Significantly, states with concealed carry laws similar to Florida's amended concealed carry law have also found it unconstitutional to seize an individual merely because he possesses a concealed firearm. *See, e.g.*, *Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019) (after reviewing its own laws, which allow properly licensed individuals to carry a concealed firearm, the Pennsylvania Supreme Court found "no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public . . . . Although the carrying of a concealed firearm is unlawful . . . for a person not licensed to do so, there is no way to ascertain an individual's licensing status . . . merely by his outward appearance" and therefore, "there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity").

more, does not justify a *Terry* stop."); *Slydell v. State*, 240 So. 3d 134 (Fla. 2d DCA 2018) (holding officers had no basis to seize the defendant where he was observed walking with a firearm in his shorts pocket because aside from the gun, officers "did not observe any conduct that would constitute a crime or impending crime," and noting that whether the defendant had a concealed weapons permit was "a fact that an officer cannot glean by mere observation"); *Regalado v. State*, 25 So. 3d 600 (Fla. 4th DCA 2009) (holding, consistent with the Fourth Amendment and federal law precedent, that "stopping a person solely on the ground that the individual possesses a gun violates the Fourth Amendment"). To hold otherwise would invert the burdens—transforming a protected right into a presumed illegality—which cannot be in light of the constitutionally protected right to keep and bear arms, as well as the Florida Legislature's purposeful amendment of the concealed carry statute in favor of firearm possession.

The caselaw from Florida is in line with other federal courts that have addressed the constitutionality of seizures based upon the possession of a firearm in states where such possession is presumed lawful. As an initial matter, the United States Supreme Court has

23

already rejected a proposed "firearm exception" to the reasonable suspicion rule. *Florida v. J.L.*, 529 U.S. 266, 272–73 (2000). That is, the mere presence of a firearm does not, by default, given police the right to conduct an investigatory stop. And, in states that permit concealed carry and open carry, this is all the more true. *See, e.g.*, *United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) (Where "[i]t is lawful for certain individuals in the Virgin Islands to carry a firearm provided that a license is obtained," and "[a]bsent any information about the criminality of the firearms, the mere possession of the firearms could not provide [the officer] with reasonable suspicion to stop the vehicle."); *United States v. Ubiles*, 224 F.3d 213, 217–18 (3d Cir. 2010) (finding no reasonable suspicion that criminal activity was afoot where individual was observed carrying a firearm in a large crowd because it is not a crime to possess a firearm in the Virgin Islands "nor does a mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, justify an officer in stopping a suspect absent the reasonable suspicion required by Terry"); *United States v. Black*, 707 F.3d 531 (4th Cir. 2013) ("Being a felon in possession of a firearm is not the default status. More importantly, where a state permits individuals to openly carry firearms,

24

the exercise of this right, without more, cannot justify an investigatory detention.  Permitting such a justification would eviscerate Fourth Amendment protections for lawfully armed individuals in those states."); *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131–33 (6th Cir. 2015) (noting that where the state legislature "has decided its citizens may be entrusted with firearms on public streets," the police have "no authority to disregard this decision" by subjecting law-abiding citizens to *Terry* stops); *United States v. Leo*, 792 F.3d 742, 749–752 (7th Cir. 2015) (rejecting "frisk" and search of backpack on suspicion that it contained a gun in light of "important developments in Second Amendment law together with Wisconsin's [concealed carry] gun laws"); *Duffie v. City of Lincoln*, 834 F.3d 877, 883 (8th Cir. 2016) ("Nebraska law permits individuals who are at least 18 years old to open carry handguns in public.  The City of Lincoln does not restrict an individual's right to open carry except in certain locations.  Moreover, the mere report of a person with a handgun is insufficient to create reasonable suspicion.") (citations omitted); *United States v. Brown*, 925 F.3d 1150, 1154 (9th Cir. 2019) (reversing the district court's denial of a motion to suppress in part because "[i]n Washington State, it is presumptively lawful to carry a

gun," and therefore, observing the defendant in possession of a gun "created at most a very weak inference that he was unlawfully carrying the gun without a license, and certainly not enough to alone support a *Terry* stop").

Furthermore, the detectives here were not entitled to presume that Mr. Joseph did not have a concealed carry permit for the firearm in his hoodie pocket. *See, e.g.*, *Delaware v. Prouse*, 440 U.S. 648, 662 (1979) (finding it unreasonable under the Fourth Amendment for law enforcement to stop an automobile and detain the driver based upon a presumption that the driver may be unlicensed without first having a reasonable articulable suspicion that the driver is unlicensed). The Supreme Court has rejected outright the view that merely engaging in a licensable activity is sufficient to authorize law enforcement to inspect whether the person is, in fact, licensed without some evidence indicating otherwise. *Prouse*, 440 U.S. at 663.

Here, Mr. Joseph was immediately seized upon the detectives' observation of a concealed firearm in his hoodie pocket. Detective Escarra conceded as much at the suppression hearing, responding, "Because he had a gun" in response to the question, "Why did you decide

to stop the Defendant?" (DE 67:14.) As noted above, such an observation—in a state like Florida, where the carrying of a concealed firearm is presumptively lawful behavior—provides no basis for a *Terry* stop, let alone a full-blown arrest. In Florida, there is no violation of a statute—and therefore no crime—based solely upon the possession of a concealed firearm.

That the stop occurred in an area known for narcotics sales where a suspected drive-by shooting had occurred approximately two weeks earlier does not change the analysis. "[R]easonable suspicion" must be more than an "inchoate and unparticularized suspicion or hunch"; the Fourth Amendment requires that police articulate "some minimal level of objective justification" for making the investigatory stop. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotation marks omitted). And, "[a] search or seizure is ordinarily unreasonable in the absence of *individualized* suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (emphasis added). Detectives had no information particularized and individualized specifically to Mr. Joseph whatsoever.

27

Detectives did not know Mr. Joseph. They did not know if he had any prior criminal history, nor did they know if he possessed a concealed carry permit. They did not suspect him of any involvement in the drive-by shooting that had occurred approximately two weeks earlier in the vicinity of the house they were surveilling, nor did they witness him engage in any narcotics transactions whatsoever. They observed Mr. Joseph get a haircut and then continue on his way on foot, with a suspected firearm in his hoodie pocket. That is it. His mere presence in a high-crime area alone is insufficient to establish reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."); *see also United States v. Peters*, 60 F.4th 855, 867 (4th Cir. 2023) ("And neither does Officer Butler's general observation that drug-dealing and armed violence are chief complaints to police strongly support a particularized finding of reasonable suspicion in this case.") (internal quotation marks omitted). Without the presence of a concealed firearm, all detectives saw was a man getting a haircut and then walking down the street in the middle of the day. That is surely

28

not enough to justify the intrusion of a *Terry* stop. *See United States v. Williams*, 731 F.3d 678, 692 (7th Cir. 2013) (Hamilton, J., concurring) ("Even a *Terry* stop alone, without a frisk, still requires a 'particularized and objective basis for suspecting the particular person stopped of *criminal activity*.'") (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)) (emphasis added).

Mr. Joseph's seizure was constitutionally deficient. It is not a crime in the State of Florida to walk down a public street in the daytime in possession of a concealed firearm. In fact, such conduct is strongly approved of both by the Florida Legislature, its courts, and the United States Supreme Court. As such, the detectives here lacked the reasonable, articulable, and particularized suspicion necessary to effectuate a valid seizure of Mr. Joseph. And, they certainly did not have probable cause for his arrest. As such, this Court should reverse the district court's denial of Mr. Joseph's motion to suppress. To hold otherwise would eviscerate Fourth Amendment protections for the lawfully armed individuals of the State of Florida and create unconstitutional gun-free zones where individuals are forced to choose between their Second and Fourth Amendment rights. *Cf. United States*

29

*v. Rahimi*, 144 S. Ct. 1889, 1938 (2024) (Thomas, J., dissenting) (lamenting the creation of effective gun-free zones as "eviscerate[ing] the general right to publicly carry arms for self-defense").   That just cannot be.

## II.   FOLLOWING *BRUEN*, 18 U.S.C. § 922(g)(1) IS FACIALLY UNCONSTITUTIONAL, AND MR. JOSEPH'S CONVICTION MUST BE VACATED

Strict application of the two-step Second Amendment test set forth in *Bruen* requires a finding that 18 U.S.C. § 922(g)(1) is unconstitutional, and Mr. Joseph's conviction cannot stand.

### A. Background: The Evolution of Second Amendment Law from *Heller* to *Bruen*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that based on the text of the Second Amendment and history, the amendment "conferred an individual right" "to possess and carry weapons in case of confrontation."  *Id.* at 576, 582, 592–95.

But, in *Heller*, the Supreme Court did not go any further than resolving the specific Second Amendment claim raised in that case.  The

Court did not definitively establish a test for evaluating *other* Second Amendment claims, define the broader contours of the fundamental Second Amendment right, or delimit the outer bounds of that right. *See United States v. Jimenz-Shiloh*, 34 F.4th 1042, 1050 (11th Cir. 2022) (Newsom, J., concurring) (recognizing that *Heller* left the lower courts "in an analytical vacuum"; citing *Silvester v. Becerra*, 138 S. Ct. 945, 947 (2018) (Thomas, J., dissenting from denial of certiorari) ("acknowledging that the Supreme Court 'has not definitively resolved the standard for evaluating Second Amendment claims'")).

It was only this past term in *Bruen* that the Supreme Court set forth an actual "test" for deciding the constitutionality of all firearm regulations. After first clarifying that the courts of appeal had misunderstood and misapplied *Heller* by embracing means-end scrutiny as having any role in Second Amendment analysis, *see* 597 U.S. at 17–24, *Bruen* clarified the "text and history" approach of *Heller* by newly bifurcating "text" and "history" into separate steps of an analysis to be used for deciding the constitutionality of all firearm regulations going forward. *See Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1321(11th Cir. Mar. 9, 2023).

31

At Step One of *Bruen*'s Second Amendment test, courts are to consider *only* whether "the Second Amendment's plain text covers an individual's conduct." 597 U.S. at 17. If it does, *Bruen* held, "the Constitution presumptively protects that conduct." *Id.* And, *Bruen* clarified, regulating presumptively protected conduct is unconstitutional unless the government, at Step Two of the analysis, can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Id.* at 24, 37.

*Bruen*, notably, also extended *Heller*'s reasoning by newly articulating specific burdens and rules to govern the historical "tradition" inquiry. First, *Bruen* made clear that the burden of proof at Step Two rests *entirely* with the government. The government alone must "establish the relevant tradition of regulation." *Id.* at 58 n.25. If it does not, courts "are not obliged to sift the historical materials for evidence to sustain the [challenged] statute." *Id.* at 60. Rather, *Bruen* held, consistent with ordinary "principle[s] of party presentation," courts must "decide a case based on the historical record compiled by the parties." *Id.* at 25 n.6. If that record yields "uncertainties," the Supreme

32

Court dictated, the lower courts should rely on *Bruen*'s "default rules"—the presumption of unconstitutionality at step one and the government's burden at step two—"to resolve [those] uncertainties" in favor of the view "more consistent with the Second Amendment's command." *Id.* In other words, and consistent with the rule of lenity, any possible tie on a Second Amendment challenge goes to the defendant.

Second, where as in *Heller* and *Bruen*, "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing the problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. Stated differently, § 922(g)(1) is unconstitutional unless the government shows a tradition of "distinctly similar historical regulation" as of 1791 when the Second Amendment was ratified. *Id.* at 17–18, 26.

Third, the government's burden at Step Two of the new *Bruen* analysis does not stop at identifying a "distinctly similar historical regulation." Rather, the government must show that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.* And a "tradition" of regulation requires more than one

or two isolated examples. It requires a "widespread" historical practice "broadly prohibiting" the conduct in question. *Id.* at 36–39. Although *Bruen* did not establish a clear threshold for determining when a historical practice rises to the level of a "tradition," it did hold that "a single law, in effect in a single State" is not enough, and even expressed doubt that regulations of three of the thirteen colonies "could suffice." *Id.* at 46, 65.

Finally, in weighing historical evidence, *Bruen* underscored that courts must take careful account of the relevant time frame. Indeed, *Bruen* held, "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*," which in the case of the Second Amendment was in 1791. *Id.* (emphasis added). As a general rule, the longer a historical regulation pre- or post-dates this period, the less relevance it carries. *Id.* at 34–37. While historical practices "from the early days of the Republic" may be relevant in interpreting an "ambiguous constitutional provision" if the practice was "open, widespread, and unchallenged," *id.* at 36, the relevance of such practices quickly fades and ultimately vanishes as one

approaches the mid- to late-19th century.  *Id.*  At most, *Bruen* clarified,
practices from the mid-late 19th century can provide "secondary"
evidence to bolster or provide "confirmation" of a historical tradition that
"had already been established."  Id. at 37.  But indisputably, by the time
one gets to the 20th century, the relevance of historical evidence is all
but nonexistent, so much so that the Supreme Court in *Bruen* declined
to "address *any* of the 20th century historical evidence brought to bear
by [the government] or their *amici.*"  *Id.* at 66 n.28 (emphasis added).  In
short, to meet the *Bruen* Step Two inquiry, the historical tradition must
be "longstanding," *id.* at 40, which means dating from 1791.

In setting forth this new two-step standard, with specific burdens
and rules at each step, *Bruen* abrogated the entire body of Second
Amendment caselaw in this Circuit that had developed after—but
unfortunately, misapplied—*Heller*, including *United States v. Rozier*, 598
F.3d 768 (11th Cir. 2010).  Although the *Rozier* panel held that "statutes
disqualifying felons from possessing a firearm under any and all
circumstances do not offend the Second Amendment," *id.* at 771, it
reached that conclusion without considering the "plain text" of the
Second Amendment, including *Heller*'s specific determination that

reference to "the people" in the Second Amendment "unambiguously refers" to "all Americans."  554 U.S. at 579–81 (reasoning that any other interpretation of that text would be inconsistent with the Court's interpretation of the same phrase, "the people," in the First, Fourth, Ninth, and Tenth Amendments).

And beyond ignoring the Second Amendment's plain text as analyzed in *Heller*, *Rozier* also failed to consider the actual history of § 922(g)(1), as required by both *Heller* and *Bruen*.  Rather than engaging in the type of meticulous historical analysis dictated by both *Heller* and *Bruen*, *Rozier* simply relied on dicta in *Heller* about "longstanding prohibitions" against felons possessing firearms, *see* 598 F.3d at 768 (citing *Heller*, 554 U.S. at 2816-17 ("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons")).  Notably, that dicta was provably wrong since, as detailed above, felon disarmament bans are of extremely recent vintage. And, as confirmed by *Bruen*, 1791 is the relevant benchmark for determining whether there has been a consistent historical "tradition" of regulation.

Under well-settled Circuit precedent, dicta—even Supreme Court dicta, if it is "devoid-of-analysis" (as this particular dicta was in *Heller*)—is "not binding on anyone for any purpose." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010); *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006); *cf. Reynolds v. Behrman Capital IV L.P.*, 988 F.3d 1314, 1322 (11th Cir. 2021). And this Court has also been clear that where—as in *Bruen*—the Supreme Court sets forth a new "mode of analysis," it abrogates prior circuit precedent analyzing the same or even related legal questions under a different "mode of analysis." *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008); *see also Babb v. Sec'y, Dep't of Veterans Affairs*, 992 F.3d 1193, 1196 (11th Cir. 2021); *Dawson v. Scott*, 50 F.3d 884, 892 n. 20 (11th Cir. 1995); *United States v. Howard*, 742 F.3d 1334, 1343–45 (11th Cir. 2014); *Santiago-Lugo v. Warden*, 785 F.3d 467, 474 n.4 (11th Cir. 2015); *United States v. Lopez*, 562 F.3d 1309, 1312 (11th Cir. 2009).

These abrogation precedents confirm that *Rozier* has *not* survived *Bruen*. Accordingly, the Court must consider as a matter of first impression here—under *Bruen*'s newly-articulated two step analysis—the "plain text," history, and tradition questions *Rozier* itself failed to

37

consider. *See United States v. Jackson*, 55 F.4th 846, 853–54 (11th Cir. 2022) (clarifying that under the "prior panel precedent rule," "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedent;" where a prior court has "never squarely addressed" an issue, a subsequent panel is free to address it on the merits; citing cases).

For the reasons set forth below, § 922(g)(1) fails both steps of *Bruen*'s Second Amendment test.

## B. *Bruen* Step One: The Second Amendment's "plain text" Protects Mr. Joseph's Public Possession of a Handgun

Applying *Bruen's* newly-defined first step for Second Amendment analysis, the Court should hold that "the Second Amendment's plain text covers [Mr. Joseph's] conduct." *Bruen*, 597 U.S. at 22–26. For indeed, the text of the Second Amendment's operative clause contains only three elements, guaranteeing the right (1) "of the people," (2) "to keep and bear," (3) "arms." *Heller*, 554 U.S. at 579–95. Mr. Joseph and his conduct fall squarely within these elements.

First, as an American citizen (PSI at p. 3) and life-long member of the national community (PSI ¶ 51), Mr. Joseph is part of the "people"

38

protected by the Second Amendment.  The Supreme Court in *Heller* was clear that "the people" as used in the Second Amendment "unambiguously refers" to "*all Americans*"—that is, "*all* members of the political community," "not an unspecified subset."  *Id.* at 579–81.

In so holding, the Court reasoned first that "the people" must have the same meaning in the Second Amendment, as in the First Amendment's Assembly-and-Petition Clause, the Fourth Amendment's Search-and-Seizure Clause, and in the Ninth and Tenth Amendments. *Id.* at 579–80 (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990) (noting that "the people" was a "term of art,"[4] which had the same meaning as in other parts of the Bill of Rights)).

Moreover, the Court also found significant in *Heller* that the use of the term "the people" in the Second Amendment's operative clause "contrasts markedly with the phrase 'the militia' in the prefatory clause," given that, at the time the Amendment was drafted, "the militia" was only comprised of a "subset" of the community: namely, able bodied males

---

[4] Dictionaries at the time defined "the people" as "[t]he body of persons who compose a community, town, city or nation"—a term "comprehend[ing] all classes of inhabitants." II Noah Webster, *An American Dictionary of the English Language* (1828).

within a certain age range. 554 U.S. at 580–81. Since well-recognized rules of constitutional construction require reading words in context, and giving different meanings to different terms within a single provision, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167–68 (2012), Congress's use of the different terms "militia" and "people" within separate clauses of the same constitutional provision confirms that under the "plain text" of the Second Amendment, "the people" is a much broader term encompassing all Americans (including felons, who notably were not exempted from militia duty).

Finally, in the same way that *Bruen*—considering *only* the plain text of the Second Amendment at Step One of its analysis—found dispositive that "[n]othing the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," 597 U.S. at 32, it should be dispositive here that the Second Amendment likewise does not draw a felon/non-felon distinction. Indeed, even prior to *Bruen*, both this Court and others had recognized that the term "people" in the Second Amendment is *not* textually limited to law-abiding citizens. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (noting that even "dangerous felons" are "indisputably part of

40

'the people'" for Second Amendment purposes); *see also United States v. Meza-Rodriguez*, 798 F.3d 664, 671 (7th Cir. 2015) (holding that a person's criminal record is irrelevant in determining whether he is among "the people" protected under the Second Amendment; noting that the amendment "is not limited to such on-again, off-again protections"). Under *Brue*n's newly-dictated "plain text" analysis for Step One, Mr. Joseph is unquestionably part of "the people" covered by the Second Amendment.

As to the other textual elements in the Second Amendment's operative clause, *Bruen* has confirmed that the right to "keep" and "bear" arms includes the right to possess/carry arms outside the home. *See Bruen*, 597 U.S. at 31–34. And "arms" plainly includes handguns, like a pistol. *See Heller*, 554 U.S. at 582 & 629 (handguns are "the quintessential self-defense weapon"); *see also Bruen*, 597 U.S. at 28, 46–47; *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018).

Accordingly, the Second Amendment's plain text covers, and thus "presumptively protects," the conduct criminalized in § 922(g)(1) and Mr. Joseph's specific conduct of possessing/carrying a loaded handgun in

41

public.  Thus, he has satisfied Step One of *Bruen*'s Second Amendment analysis.

### C. *Bruen* Step Two: The Government Cannot Meet Its Burden of Showing § 922(g)(1) Is Consistent With the Nation's "historical tradition of firearm regulation"

At the second step of Second Amendment analysis, *Bruen* requires the government to establish that § 922(g)(1)'s lifetime ban on felons possessing any firearms or ammunition "is consistent with the Nation's historical tradition of firearm regulation"—that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Bruen,* 597 U.S. at 37.  The government cannot meet that heavy burden.

As a threshold matter, because § 922(g)(1) is directed at a longstanding societal problem that "has persisted since the 18th century," *id.* at 26—felons' access to guns, and the danger of interpersonal violence therefrom—the statute is unconstitutional unless the government can show a robust tradition of "distinctly similar" regulations as of 1791, when the Second Amendment was ratified.  *Id.* But, as jurists and commentators have repeatedly recognized, there were *no* felon disarmament regulations at the time of the Founding.  *See, e.g.*, *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting).

42

In fact, the first felon-in-possession laws similar to § 922(g)(1) did not appear until the 20th century.

What is today § 922(g)(1) traces its origins to 1938, when Congress passed a statute, the Federal Firearms Act, prohibiting certain felons from "receiving" firearms. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)).  At that time, the statute "covered only a few violent offenses," *id.*, prohibiting firearm "receipt" by those convicted of crimes such as murder, rape, and kidnapping.  *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011).  It was not until 1961 that Congress amended that statute to prohibit "receipt" "by all felons."  *Skoien*, 614 F.3d at 640 (emphasis in original) (citing Pub. L. 87-342, 75 Stat. 757) (noting that under the statute, "possession" was evidence of "receipt").  And it was not until 1968, that Congress formally "changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form."  *Id.*

Thus, the first firearm regulation in America broadly prohibiting *all felons* from possessing firearms was not enacted until *almost two centuries after the Nation's founding*, when the modern version of § 922(g)(1) became law.  *See Kanter*, 919 F.3d at 464 n.12 (Barrett, J.,

dissenting) ("[T]he first general prohibition on felon gun possession was not enacted until 1961…."); *id.* at 462 ("[S]cholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms….").

Section 922(g)(1) is the *first law* in our Nation's history to broadly prohibit *all felons* from possessing a firearm. There was nothing before the 20th century, even in individual colonies or states. *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J. 1371, 1376 (2009) ("state laws prohibiting felons from possessing firearms or denying firearm licenses to felons date from the early part of the twentieth century"). As *Bruen* makes clear, such "belated innovations . . . come too late to provide insight into the meaning of the Constitution in [1791]." 597 U.S. at 36–37 (citing with approval the Chief Justice's pre-*Heller* dissent in *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008)); *see also id.* at 66 n.28 (declining to "address any of the 20th century historical evidence brought to bear by [the government] or their *amici*").

In sum, there was *no* "historical tradition," circa 1791, of gun regulations "distinctly similar" to § 922(g)(1). *Id.* at 24–26. The

"Founders themselves could have adopted laws like § 922(g)(1) to "confront" the "perceived societal problem" of violence posed by felons possessing firearms. *Id.* at 27. But they declined to do so, and that inaction indicates § 922(g)(1) "[i]s unconstitutional." *Id.*

Finally, and quite importantly, felons were not only *permitted* to possess firearms at the time of the Founding due to the absence of any laws specifically prohibiting them from doing so; felons were affirmatively *required* to possess firearms as members of the militia. Notably, in *Heller,* the Supreme Court recognized that "the Second Amendment's prefatory clause"—*i.e.*, "A well regulated Militia, being necessary to the security of a free State"—"announce[d] the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. Given that preventing elimination of the militia was the purpose of the Second Amendment, it is reasonable that the Second Amendment's protections would at least have extended to those who would have been in the militia at the time of the Founding. And historical evidence from that period, which is the most relevant period as *per Bruen*, confirms that this group most definitely included felons.

45

As noted above, *Heller* specifically defined the term "militia" in the Second Amendment's prefatory clause to mean "all males physically capable of acting in concert for the common defense."  554 U.S. at 595. And indeed, statutory law from the Founding era demonstrates that "all males" required to serve in the militia encompassed felons.  Specifically, in the first Militia Act enacted one year after the Second Amendment's ratification, Congress was clear that "each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years . . . *shall* severally and respectively be enrolled in the militia."  Act of May 8, 1792, § 1, 1 Stat. 271 (emphasis added).  The Act of 1792 further stipulated that "every citizen so enrolled . . . *shall*, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt," and various other firearm accoutrements, including ammunition.  *Id.* (emphasis added).  Although the Act "exempted" many classes of people from these requirements (*e.g.*, "all custom-house officers," "all ferrymen employed at any ferry on the post road"), felons notably were *not* among those exempted.  *Id.* § 2, § 1 Stat. 272.

And in fact, at least eight state militia statutes, passed shortly before or after 1791, contained similar requirements.  Specifically, these early state militia statutes similarly did *not* exempt felons:

- Mitchell, Statutes at Large of Pennsylvania, Act of March 20, 1780, §§ III, XXI, at 146, 154 (1700-1809);

- Wright and Potter, 7 Acts and Laws of the Commonwealth of Massachusetts, 1780-1805, ch. 14, at 381-82, 389-90 (1898);

- Thomas Greenleaf, Laws of the State of New-York, Act of April 4, 1786, at 227-28, 232-33 (1792);

- Marbury, Digest of Laws of the State of Georgia, Act of December 24, 1792, §§ 9-10, at 350 (1802);

- Constitution and Laws of the State of New-Hampshire, Act of Dec. 28, 1792, at 251-52, 256 (1805);

- Laws of the State of Delaware, ch. XXXVI, §§ 1, 2, 4, at 1134-36 (1797);

- Herty, Digest of the Laws of Maryland, "Militia," §§ 7, 15, 19, 20, at 367-70 (1799); and

- Public Statute Laws of the State of Connecticut, Title CXII, ch. I, §§ 1, 10, at 499-500, 505-06 (1808).

These federal and state militia statutes are crucial historical evidence that cannot be ignored under *Bruen*.  For indeed, they confirm that in the Founding era, felons were legally *required* to possess firearms as members of the militia.  And given that legal obligation, for the

47

government to argue that felons lack Second Amendment rights would be not only textually but historically untenable.

The fact that Founding era militia statutes *did not* exclude felons, and *did* require all militia members to possess firearms, confirms that the government cannot meet its heavy burden at *Bruen* Step Two of showing that § 922(g)(1) is "consistent with the Nation's historical tradition of firearm regulation." At the most relevant time period under *Bruen*, namely, the time period immediately preceding and post-dating adoption of the Second Amendment, *see Bruen*, 597 U.S. at 34 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them"), all white, able-bodied citizen/felons between the ages of 18–45 were required to serve in both the National and many State Militias. And because of their militia obligation, these citizen/felons were required to possess firearms.

For the above reasons, the government cannot show a historical tradition of gun regulation "distinctly similar" to § 922(g)(1). And in those circumstances, *Bruen* dictates that § 922(g)(1) be deemed facially unconstitutional, and Mr. Joseph's conviction be vacated.

## CONCLUSION

For the foregoing reasons, Mr. Joseph respectfully requests that this Court reverse the denial of his motion to suppress, and vacate his conviction and sentence.

Respectfully submitted,

HECTOR A. DOPICO
Federal Public Defender

*/s/ Anshu Budhrani*
ANSHU BUDHRANI
Assistant Federal Public Defender
Attorneys for Appellant
150 West Flagler Street, Suite 1700
Miami, Florida 33130
(305) 530-7000

49

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 9,463 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.


*/s/ Anshu Budhrani*
Anshu Budhrani

## CERTIFICATE OF SERVICE

I certify that on this 30th day of September, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and mailed four copies to the Clerk of the Court via third-party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Jonathan Colan, Assistant United States Attorney, and Daniel Matzkin, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

*/s/ Anshu Budhrani*
Anshu Budhrani

51